**YOUNG et al. v. SAN ANTONIO BREWING ASS'N.   (No. 6877.)** *

(Court of Civil Appeals of Texas.   Austin. July 1, 1925.   Rehearing Denied Oct. 7, 1925.)

**Telegraphs and telephones ☞53—Evidence insufficient to show damage in transmission of message over wrong signature.**

In action against telegraph company for loss claimed due to transmission of message of credit over bank's name, while only authorized by cashier of bank personally, evidence tending to show credit would have been extended whether signed by cashier personally or by bank *held* to negative damage resulting from change, and therefore to preclude recovery.

Appeal from District Court, Milam County; John Watson, Judge.

Action by the San Antonio Brewing Association against W. F. Young, the Western Union Telegraph Company, and others. Judgment for plaintiff against defendant last named, and it appeals.   Reversed and rendered.

Francis R. Stark, of New York City, and Spell, Naman, & Penland, of Waco, for appellant.

E. A. Camp, of Rockdale, and Chambers, Wallace & Gillis, of Cameron, for appellees.

McCLENDON, C. J.   This suit was originally brought by the appellees, a copartnership doing business under the name of the San Antonio Brewing Association, against W. F. Young, T. F. Criswell, the Buckholts State Bank, and the Western Union Telegraph Company.   Later all of the defendants were dropped from the suit except the telegraph company.   As between appellees, the original plaintiffs, and the telegraph company, the suit was for damages alleged to have resulted from delivery by the telegraph company to appellees of a forged telegram.   The case was tried without a jury, and resulted in a judgment in favor of appellees against the telegraph company for $638, besides interest and costs.   From this judgment the latter has appealed.

We have reached the conclusion that the evidence will not support a judgment in favor of appellees against appellant, and it will only be necessary to state the testimony in so far as it affects this issue.

Appellees, in 1917, were engaged in the manufacture and sale of beer, and W. F. Young, who resided at Buckholts, Tex., was in the business of buying beer from them in carload lots, and selling it to the local retail dealers.   In the summer of 1917, Young's credit was bad; and in the latter part of August, or the first part of September, at which time he owed for a car of beer, appellees sent their auditor and traveling salesman, H. Moede, to Buckholts, and it was arranged between T. F. Criswell, who was cashier of the Buckholts State Bank, and Moede, that Young should deposit in the bank his collections on the previous car, and when this was done, and appellees were notified to that effect by Criswell, or the bank, they would ship to Young another car.   Under this arrangement Young would have a standing credit with appellees for one car of beer and no more.

On September 20, 1917, Young presented to Criswell a telegraphic order, addressed to the brewing company, requesting shipment of a car of beer according to specifications stated.   Criswell added to this telegram the words, "Remittance previous shipment follows," and signed his own name.   The evidence is silent as to what was done with this telegram and those referred to below after they were signed by Criswell and turned over to Young for transmission.   The telegraph company delivered to appellees at San Antonio a message of the same date and wording, except that it was signed "Buckholts State Bank."   Upon the faith of this telegram, appellees shipped to Young the car of beer as specified.   The August car, to which the last portion of this telegram related, was afterwards paid for either by Criswell or the bank.   On October 16, Young presented Criswell another telegram, addressed to appellees, ordering another car of beer, giving the specifications.   To this telegram Criswell added the words, "We remit to cover previous shipment," and signed his own name.   The message contained in this telegram was likewise delivered to appellees in San Antonio, but as delivered bore the signature, "Buckholts State Bank."   On November 8th, Young presented to Criswell another telegram, addressed to appellees, ordering another car of beer, and giving specifications.   Criswell signed his own name to this telegram, without adding anything to it.   The message contained in this telegram was also delivered by the telegraph company to appellees at San Antonio, but as delivered bore the signature, "Buckholts State Bank."   At the time this telegram was received by appellees, both the September and October cars were unpaid for, and they were unwilling to extend Young further credit, so they shipped the car as specified to their own order at Buckholts, and sent Moede with the bill of lading to Buckholts to adjust the matter.   Adjustment was made by delivering the car to Young, either upon payment or guaranty of payment by Criswell of the amount due on the September car.   The October car was never paid for, and the evidence showed that Young was insolvent.   The principal amount of the judgment represents the value of the October shipment.

The contention of appellees is that the Oc-

tober telegram was a forgery, that they shipped the October car on the faith of it, and that by reason thereof they were caused to lose the value of that shipment.

We will quote the substance of the testimony with reference to the arrangement made between Moede and Criswell, in August or September, 1917.

A. T. Stevens, who was assistant secretary of the brewing association, testified as follows:

"It is a fact that all orders made by telegram signed by Mr. Criswell or the Buckholts State Bank for Mr. Young were promptly filled, and it was immaterial with the San Antonio Brewing Association as to whether the telegram was signed by Mr. Criswell or the bank."

· The following quotations are from Moede's testimony:

"After the San Antonio Brewing Association refused to ship or sell to W. F. Young any more of its products, T. F. Criswell, acting for himself and as cashier of the Buckholts State Bank, importuned the San Antonio Brewing Association to make further sales and shipments of beer to said Young, which the San Antonio Brewing Association refused to do, unless he (the said Criswell), acting on behalf of himself and the Buckholts State Bank, would agree to pay for all beer thereafter sold and shipped by San Antonio Brewing Association to Young.

"Criswell agreed and obligated himself and the Buckholts State Bank that he (Criswell) and Buckholts State Bank would pay the San Antonio Brewing Association for all beer that might be shipped to W. F. Young at Buckholts, Tex., providing none was shipped except upon a telegraphic order, signed by T. F. Criswell or the Buckholts State Bank. The San Antonio Brewing Association agreed with said Criswell, acting for himself and said Buckholts State Bank to ship to said Young at Buckholts, Tex., whenever they were directed to do so by telegram sent to them at San Antonio, Tex., signed by T. F. Criswell, or the Buckholts State Bank."

Criswell's version of the transaction is in the following quotation from his testimony:

"Mr. Moede told me that Young was indebted to the brewery, and that they were shipping him beer, and he was selling it and not making any remittance to cover, and the San Antonio Brewing Association wanted to handle it so they could get the money, and they asked me if I would agree to let the money be deposited in the bank, and when Young got enough to send it in, and I told Moede there was no objection on my part. I understood Young was to have sufficient funds to pay out one car when he ordered out another. It was understood he was to have leeway or margin of one car. He was to have one car leverage; that is, he was allowed credit to the extent of one car. It was understood that when one car to which he was entitled to credit was sold, and he should want another, the money was to be deposited in the bank. There was no understanding as to who would sign the telegram or write the letters. I don't think anything was said about who was to send the telegrams. The understanding resulted in an agreement to the effect that the San Antonio Brewing Association would send a car of beer on credit, and, when that car had been sold and the money for same deposited in the bank, then I would remit it before Young could get another car.

"I was present when Mr. Moede and Young made an agreement with reference to how the beer should be shipped to Young some time about August, 1917. I do not recall the date, but it was some time prior to the sending of the telegram in question. At that time it was understood that Young would collect the money and deposit it in my bank, and then, when a carload of beer was ordered, the payment of the previous car must be made.

"This agreement that I had with Mr. Moede was to handle this personally; it was not for the bank. I don't suppose the bank's name was mentioned."

Whatever minor differences there may be in the testimony of the several witnesses with reference to the arrangement between Criswell and Moede in August or September, 1917, it is quite clear that the brewing association agreed to ship Young the beer in carload lots whenever it received advice from Criswell guaranteeing payment of the previous car. According to Criswell's testimony, the bank was in no way involved in this arrangement, but he was acting in his individual capacity. The testimony of Moede is that he was acting both for himself and the bank, and that telegrams were to be signed either by him or the bank. The testimony of Stevens is that the brewing association understood the transaction to be that beer was to be shipped upon requisition either of Criswell or the bank, and that it would have made no difference had the telegrams in question been signed by Criswell individually. We think clearly under this testimony that Criswell, if he acted for himself alone, or the bank, if he was in fact acting for it and had authority so to do, was bound by the October telegram in the same manner he or it would have been bound had the telegram been delivered to the brewing association over the signature of Criswell instead of the signature of the bank. · It is true that no explanation is given regarding this telegram from the time it was signed by Criswell and turned over to Young for transmission to the brewing association and the time it was delivered by the telegraph company to the brewing association in San Antonio with the alteration in signature. But it was conceded by Criswell in his testimony that Young had full authority to transmit the message as signed by him. If Young had done so, and the message had been delivered in the exact language as sent, including the signature, then clearly there would have been no liability whatever upon the part of the telegraph company.

How the difference occurred in the signature is wholly a matter of conjecture; but it is perfectly clear, in fact there is no other reasonable hypothesis upon which to explain

the delivery of the telegram in San Antonio, that the telegram signed by Criswell individually formed the basis of the telegram delivered to the brewing association, and upon which it acted in shipping the beer. The brewing association would have been bound under its agreement with Young to ship the beer if the telegram had borne Criswell's signature, and the uncontradicted evidence shows that the beer would have been shipped in that event. The change in the signature, therefore, had nothing to do with the action of the brewing association in shipping the beer and extending credit therefor to Young; nor do we think it made any difference in the liability either of Criswell or the bank under the terms of the telegram as actually signed by Criswell. The brewing association had, under the telegram delivered to it, the same cause of action it would have had against Criswell, the bank, or both, if there had been no change or alteration in the signature. Conceding, therefore, wrong or negligence on the part of the telegraph company in delivering the telegram over the signature of the bank, and that there was no excuse or mitigation for this wrongful or negligent act, still the evidence, we think, clearly negatives any damage as the result of the change in signature, and for that reason appellees are not entitled to recover.

The judgment of the trial court is reversed, and judgment here rendered in favor of appellant.

Reversed and rendered.